## THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

**ESTATE OF DE'ANGELO BROWN**                                              **PLAINTIFF**

**v.**                              **Case No.  3:20-cv-00099-KGB**

**E.C. WEST,** *et al.*                                              **DEFENDANTS**

### OPINION AND ORDER

Before the Court is Chief E.C. West, Officer Prince Bohanon, Officer Michael Clark, Officer John Buford, Sergeant Matthew McKee, Officer Daniel Magill, and Officer James "Matt" Presley III's (collectively "defendants") motion for summary judgment (Dkt. No. 20).  Plaintiff the Estate of De'Angelo Brown, deceased, through the special administrator of the estate Bryce Brewer ("Mr. Brown's Estate" or "the Estate"), brings this action against defendants each in their individual and official capacities as the Chief and as members of the West Memphis Police Department ("WMPD") (Dkt. No. 1).  Mr. Brown's Estate alleges that defendants violated Mr. Brown's Fourth and Fourteenth Amendment rights on January 16, 2019, when they shot and killed Mr. Brown while trying to end a high-speed car chase (Dkt. Nos. 1, ¶¶ 7-30; 22, ¶¶ 1-72).  Mr. Brown's Estate seeks relief under 42 U.S.C. § 1983, the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-105 *et seq.* ("ACRA"), and Arkansas tort law (Dkt. Nos. 1, ¶¶ 5, 6, 31-38; 20).

Defendants filed their motion for summary judgment contending that no dispute of material fact exists and that they are entitled to judgment as a matter of law (Dkt. No. 20, ¶ 3).  Fed. R. Civ. P. 56.  Mr. Brown's Estate disagrees and points to two disputed facts to argue that defendants' motion must fail (Dkt. Nos. 27, ¶ 3; 29).  The Court recognizes that this was a tragic event.  Based on the record evidence, viewed in the light most favorable to the Estate with all reasonable

inferences construed in the Estate's favor, the Court grants defendants' motion for summary judgment (Dkt. Nos. 1, ¶¶ 5, 31-35; 20).

## I.      Factual Background

Unless otherwise noted, the following facts are taken from defendants' statement of undisputed material facts and the Estate's response to defendants' statement of undisputed material facts (Dkt. Nos. 22; 29).[1]

### A.      The High-Speed Chase

On January 16, 2019, at approximately 9:23 p.m., Officer Bohanon of the WMPD attempted to perform a traffic stop on a green Toyota Camry near the intersection of Avalon and Broadway Streets in West Memphis, Arkansas, for failing to dim properly the high beams (Dkt. No. 22, ¶ 1).  When Officer Bohanon turned around and got behind the vehicle, he also noticed that there was no license plate and notified dispatch (*Id.*, ¶ 2).  Officer Bohanon activated his blue lights and siren to initiate the stop (*Id.*).  The driver of the Toyota, Megan Rivera, did not pull over and stop (*Id.*, ¶ 3).  Mr. Brown was a passenger in the vehicle (*Id.*, ¶ 4).  Officer Bohanon notified dispatch that the suspect vehicle was not stopping (*Id.*).  Because the Toyota continued to flee, the attempted traffic stop turned into a vehicle pursuit, all of which was captured by several of the defendants' dash cameras (*Id.*, ¶¶ 5, 5 n.1).

At the beginning of the pursuit, the suspect vehicle was travelling at approximately 45 miles per hour (*Id.*, ¶ 6).  Approximately one minute and 15 seconds into the pursuit, a second patrol vehicle joined the chase (*Id.*, ¶ 7).  When the second patrol vehicle joined, the suspect vehicle

---

[1]  Pursuant to Local Rule 56.1(c) of the *Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas*, "[a]ll material facts set forth in the statement filed by the moving party. . . shall be deemed admitted unless controverted by the statement filed by the non-moving party. . . ."  The material facts set forth in defendants' statement that the Estate of Mr. Brown did not controvert are deemed admitted by the Court.

accelerated to approximately 90 miles per hour (*Id.*, ¶ 8). The pursuit continued eastbound on Broadway at high speeds for approximately one minute (*Id.*, ¶ 9). The vehicle then turned into a residential area for approximately 40 seconds and reemerged on Broadway heading eastbound (*Id.*, ¶ 10).

In an attempt to stop the vehicle, Officer Presley called over the radio for stop sticks to be put out east of the suspect vehicle's current location (*Id.*, ¶ 11). In another attempt to stop the vehicle, Officer Johnson called over the radio to box-in the vehicle while on Broadway (*Id.*, ¶ 12). After 45 seconds on Broadway, the vehicle ran a red light and turned left onto Martin Luther King ("MLK") (*Id.*, ¶ 13). While the vehicle was fleeing northbound on MLK, an Arkansas State Trooper took the lead on the pursuit to attempt a precision immobilization technique ("PIT") to stop the vehicle (*Id.*, ¶ 14). When the Trooper pulled up alongside the fleeing vehicle to attempt a PIT, the vehicle made a left turn, and the PIT was unsuccessful (*Id.*, ¶ 15). The vehicle, now facing southbound, continued fleeing on MLK (*Id.*, ¶ 16).

The pursuit continued onto the interstate service road back toward Broadway (*Id.*, ¶ 17). In another attempt to stop the fleeing vehicle, Officer Presley attempted to box-in the suspect vehicle on the service road (*Id.*, ¶ 18).[2] As the vehicle approached Broadway, in another attempt to stop the vehicle, Officer Presley requested an officer to deploy stop sticks on Broadway (*Id.*, ¶ 20). Officer Magill deployed stop sticks, which successfully punctured the back, passenger side tire (*Id.*, ¶ 21). Nonetheless, the vehicle continued fleeing westbound on Broadway with one flat tire (*Id.*, ¶ 22). Officer Presley then accelerated ahead of the suspect vehicle to attempt another box-in maneuver (*Id.*, ¶ 23).

---

[2] During a box-in maneuver, officers attempt to bring the fleeing vehicle to a complete stop by surrounding the vehicle and reducing speed (Dkt. No. 22, ¶ 19).

To avoid being boxed in, the suspect vehicle swerved into oncoming traffic and accelerated around Officer Presley's patrol unit (*Id.*, ¶ 24).  While driving toward oncoming traffic, the back end of the suspect vehicle began to whip back and forth, and Officer Clark warned officers over the radio that the suspect vehicle was going to lose control (*Id.*, ¶ 25).  Officer Presley again accelerated in front of the vehicle to attempt another box-in maneuver (*Id.*, ¶ 26).  Again, the suspect vehicle swerved across the road into oncoming traffic (*Id.*, ¶ 27).  Officer Presley notified all officers over the radio that the suspect vehicle was shooting into oncoming traffic again (*Id.*, ¶ 28).  The vehicle traveled toward oncoming traffic until reaching the next intersection where it turned left onto 7th Street (*Id.*, ¶ 29).

While turning onto 7th Street, Officer Bohanon radioed that the vehicle had just lost a tire (*Id.*, ¶ 30).  Three patrol vehicles again attempted to box-in the suspect vehicle on 7th Street (*Id.*, ¶ 31).  To avoid being boxed in, the suspect vehicle swerved back and forth across the road (*Id.*, ¶ 32).  The suspect vehicle hit Officer Bohanon's patrol vehicle, and Officer Clark called over the radio that the suspect vehicle "just struck a unit, just struck a unit" (*Id.*, ¶ 33).  The suspect vehicle then turned onto Van Buren Street, which passes through a residential area (*Id.*, ¶ 34).  In an attempt to stop the vehicle, Officer Presley again requested stop sticks be placed ahead of the suspect vehicle (*Id.*, ¶ 35).  The vehicle sped through six stop signs on Van Buren, and as the vehicle sped through the intersections, it bottomed out several times causing sparks to shoot off the underside of the vehicle (*Id.*, ¶ 36).  Near this time, Officer Presley asked over the radio if the State Trooper was still in the pursuit (*Id.*, ¶ 37).  It is WMPD policy that, if state police are involved in the pursuit, the state police unit takes position as the primary unit so long as it can be done safely (*Id.*, ¶ 38).

The suspect vehicle then crossed Broadway on 14th street and then turned eastbound onto McAuley (*Id.*, ¶ 39).  Officer Presley radioed to the other officers to attempt to box-in the suspect

vehicle again (*Id.*, ¶ 40).  McCauley is a residential street, and Officer Clark informed the officers over the radio that "[t]here's a lot of cars on the sides of the road.  I don't wanna hit a car coming around him" (*Id.*, ¶ 41).  Officer Bohanon made contact with the suspect vehicle in an attempt to stop it but was unsuccessful (*Id.*, ¶ 42).  Moments later, Officer Bohanon was able to turn the vehicle sideways, and the vehicle came to what he thought was a permanent stop (*Id.*, ¶ 43).  Thinking he had the vehicle permanently stopped, Officer Bohanon exited his vehicle (*Id.*, ¶ 44).  The suspect vehicle began fleeing through a residence's yard and back onto North McCauley (*Id.*, ¶ 45).  Officer Buford then arrived and struck the driver's side of the vehicle in an attempt to pin the vehicle against a fence (*Id.*, ¶ 46).  The vehicle came to a stop (*Id.*, ¶ 47).  Officer Buford exited his vehicle (Dkt. Nos. 22, ¶ 48; 29, ¶ 1).[3]

Officers surrounded the suspect vehicle with weapons drawn and gave multiple commands for Ms. Rivera and Mr. Brown to put their hands up and exit the vehicle (Dkt. No. 22, ¶ 49).  At this point, Officers Bohanon, Buford, and Clark and Sergeant McKee had all exited their vehicles while the vehicle was stopped (*Id.*, ¶ 50).  The suspect vehicle reversed and began to flee again (*Id.*, ¶ 51).  As the suspect vehicle began turning from North McCauley onto 18th Street, Officer Magill was advancing up 18th Street in his patrol unit toward the pursuit (*Id.*, ¶ 52).  As the suspect vehicle came around the corner onto 18th Street, Officer Magill slowed his speed to a near stop, and the suspect vehicle continued fleeing and struck Officer Magill's vehicle head on (*Id.*, ¶ 53).  Officer Presley then struck the passenger side of the suspect vehicle with his patrol car (*Id.*, ¶ 54).

### B.   Officer Struck By Vehicle

---

[3]   The parties dispute whether Officer Buford exited his patrol car thinking that Ms. Rivera's vehicle was "pinned and could no longer flee" (Dkt. Nos. 22, ¶ 48; 29, ¶ 1).  This fact is not outcome determinative, as explained in the Court's analysis discussed below.

Believing the vehicle to be disabled, Officer Magill exited his patrol unit and began giving oral commands to the suspects (*Id.*, ¶ 55). Officer Presley exited his patrol unit and approached the passenger side door (*Id.*, ¶ 56). At the same time, Officers Bohanon, Buford, and Clark and Sergeant McKee also surrounded the vehicle (*Id.*, ¶ 57). Additionally, Officers Chris McElroy, Jimelle Nicks, and Martin Gill and Sergeant Darrell Hayes had all exited their vehicles and were approaching the suspect vehicle (*Id.*). Officers Bohanon, Clark, and Presley all attempted to break the suspect vehicle's windows; however, they were unsuccessful (*Id.*, ¶ 58). During this time, Officer Presley noticed that Mr. Brown put both of his hands up, but Ms. Rivera still had her hands on the steering wheel (*Id.*, ¶ 59).

Unable to break the window, Officer Presley began pulling on the passenger-side door handle in an attempt to open it (*Id.*, ¶ 60). As the vehicle again began to flee in reverse, Officer Presley's hand became stuck in the passenger side door; he was dragged along with the vehicle and subsequently lost his balance and fell to the ground (*Id.*, ¶ 61). The suspect vehicle struck another patrol unit as it reversed (*Id.*, ¶ 62). The suspect vehicle then quickly accelerated forward and ran over both of Officer Presley's legs (*Id.*, ¶ 63). Officer Gill immediately began rendering aid to Officer Presley, and both officers remained on the ground behind the suspect vehicle (*Id.*, ¶ 64). As the vehicle ran over him, Officer Presley began firing his service pistol, aiming at Ms. Rivera (*Id.*, ¶ 65). The vehicle continued accelerating toward other officers, Officers Bohanon, Buford, Clark, and Magill and Sergeant McKee all fired their service weapons, aiming at Ms. Rivera (*Id.*, ¶ 66). Officer Magill had to jump out of the way of the vehicle to avoid being hit (*Id.*, ¶ 67). Because Officer Magill's patrol unit was blocking the vehicle from continuing to flee forward, defendant officers recognized that the vehicle could only continue fleeing by once again

reversing in the direction of Officer Presley and Officer Gill and any other officers behind the vehicle (*Id.*, ¶ 68).

At the time the officers fired their weapons, the pursuit had been ongoing for nearly 12 minutes at an average speed of 26 plus miles per hour over the posted speed limit (*Id.*, ¶ 69). Each officer fired his weapon because he believed the vehicle posed an immediate threat of serious physical injury, possibly death, to Officer Presley and/or all other officers near the vehicle, including themselves (*Id.*, ¶ 70). Although all the officers were aiming at the driver of the vehicle, Mr. Brown was struck by three bullets and died as a result (*Id.*, ¶ 71). Ms. Rivera was struck by 14 bullets and died as a result (*Id.*, ¶ 72). After the incident, all of defendant officers were placed on administrative leave with pay pending the outcome of the investigation by the Arkansas State Police regarding the discharge of firearms (*Id.*, ¶ 73). Defendant Chief West was not present nor involved in any of the events that occurred during the January 16, 2019, pursuit (*Id.*, ¶ 74).

### C.   Arkansas State Police Criminal Investigation

Following the pursuit and shooting on January 16, 2019, the WMPD immediately called in the Arkansas State Police ("ASP") to handle the criminal investigation into the officer-involved shooting (*Id.*, ¶ 75). The ASP carried out an extensive, 808-page investigation and report (*Id.*, ¶ 76). During the investigation, the ASP examined the scene of the shooting; interviewed 13 officers from the WMPD including those who shot at the driver, six members of the EMS and Fire Department teams who responded to the scene, and one resident who heard the shooting; and carried out forensics reports on the vehicle, decedents, and firearms (*Id.*, ¶ 77).

One bullet collected from Mr. Brown's body matched Officer Presley's firearm (*Id.*, ¶ 78). The other bullet recovered from Mr. Brown's clothing was inconclusive as to from whose firearm it came (*Id.*). The third bullet was not found (*Id.*). Two bullets collected from Ms. Rivera matched

the firearm of Officer Clark, and one matched the firearm of Officer Magill (*Id.*, ¶ 79). The remaining four bullets recovered from Ms. Rivera were inconclusive as to from whose firearm the bullets came (*Id.*).

On March 13, 2019, Second Judicial District Prosecuting Attorney Scott Ellington presented the evidence in the ASP Report to the Crittenden County Grand Jury. The Grand Jury returned a decision of "No True Bill," dismissing any potential criminal charges against the officers (*Id.*, ¶ 80).[4] Following the decision by the Grand Jury, on April 26, 2019, the ASP closed its investigation into the officer-involved shooting (*Id.*, ¶ 81).

D.    **WMPD's Internal Investigation**

In addition to the ASP's investigation, an internal investigation into the officers' use of force was conducted by Major Stacey Allens of the WMPD (*Id.*, ¶ 82). In carrying out his investigation, Major Allens thoroughly reviewed the ASP Case File and compared it with the policy and procedures of the WMPD (*Id.*, ¶ 83). In his March 14, 2019, final report and recommendation, Major Allens concluded that the officers acted within the scope of departmental policy and used deadly force only when all other measures had been exhausted (*Id.*, ¶ 84). Major Allens noted that the officers' actions were justified by WMPD policies, and he recommended that the officers return to active duty at the discretion of Chief West (*Id.*, ¶ 85).

E.    **WMPD's Department Policies**

---

[4]   Mr. Brown's Estate maintains that the result of the Crittenden County Grand Jury's findings "is wholly irrelevant to the case at bar[,] . . . . [as] a State Grand Jury['s] deci[sion] to bring charges has no bearing on the [d]efendants violation [of] Mr. Brown's Constitutional rights." (Dkt. No. 29, ¶ 2). The Court agrees with the Estate, to the extent that the result of the Grand Jury's findings do not inform the Court's analysis regarding the alleged constitutional violations and claims discussed in this Order.

Mr. Brown's Estate has no knowledge of any information contained within the WMPD policies and procedures manual (*Id.*, ¶ 86).  None of the WMPD policies and procedures require its officers to act unconstitutionally (*Id.*, ¶ 87).  The WMPD's Rules and Regulations in its policy manual provide that every officer "shall act in accord with the Constitutions, statu[t]es, ordinances, administrative regulations and the official interpretation thereof, of the United States, the State of Arkansas, the County of Crittenden, and the City of West Memphis" (*Id.*, ¶ 88).  The West Memphis City Council is the final policymaker for the City of West Memphis, Arkansas, with respect to the policies of its police department (*Id.*, ¶ 89).  *See* Ark. Code Ann. § 14-52-101.

The WMPD policy regarding police pursuits provides that "those making decisions to initiate or terminate a pursuit should consider the nature of the offense, the time of day, an evaluation of weather, traffic conditions, geography, and familiarity with the area, types of official vehicles involved, and the actions of the fleeing driver" (*Id.*, ¶ 90).  Only the primary officer and the supervising officer may terminate a pursuit (*Id.*, ¶ 91).  All other officers may only terminate their personal involvement in the pursuit (*Id.*).  The pursuit policy provides:  "[a] Pursuit should be terminated where:  the officer or supervising officer believes that the danger to the public outweighs the need for immediate apprehension of the suspect; [a] supervising officer orders the pursuit terminated; the officer knows the name and address of the suspect and the offense involved is a traffic violation, a misdemeanor, or a non-violent felony; or the officer loses visual contact with the fleeing vehicle for an extended period of time" (*Id.*, ¶ 92).  The WMPD Policy Manual does not limit the number of police vehicles that can participate in the pursuit of a suspect vehicle (*Id.*, ¶ 93).

The WMPD's policy on the use of deadly force is in Chapter 7, Section 2 of the WMPD Policy Manual (*Id.*, ¶ 94).  The policy provides that:  "deadly force may be used . . . after all other

reasonable means of apprehension or prevention have been exhausted . . ." and the officer is acting "in self-defense where the officer has been attacked with deadly force, is being threatened with the use of deadly force; or where the officer has probable cause and reasonably perceives an immediate threat of deadly force . . . [or] in defense of others where a third party has been attacked with deadly force; is being threatened with the use of deadly force; is in danger of serious bodily injury or death during the actual commission of a crime against his/her person; or where the officer has probable cause and reasonably perceives an immediate threat of deadly force to a third party" (*Id.*).

### F.    WMPD Officer Training

Mr. Brown's Estate has no knowledge of the training that the WMPD officers receive, nor does Mr. Brown's Estate have any knowledge of the training history of any defendant officers (*Id.*, ¶ 95).  The WMPD follows the police officer training requirements set forth under Arkansas' Commission on Law Enforcement Standards and Training ("CLEST") program (*Id.*, ¶ 96). CLEST requires that officers complete a minimum of 24 hours of CLEST certified training annually, to include firearms training and racial profiling (*Id.*, ¶ 97).

Officer Bohanon has worked in law enforcement for approximately three years (*Id.*, ¶ 98). He completed his basic law enforcement training at the West Memphis Police Academy (*Id.*).  In 2018, Officer Bohanon completed approximately 149 hours of CLEST certified training (*Id.*, ¶ 99).

Officer Buford worked with the WMPD for approximately three years (*Id.*, ¶ 100).  He completed his basic law enforcement training at the Black River Technical College Law Enforcement Training Academy (*Id.*).  In 2018, Officer Buford completed approximately 243 hours of CLEST certified training (*Id.*, ¶ 101).

Officer Clark has worked in law enforcement for approximately five years (*Id.*, ¶ 102).  He completed his basic law enforcement training at the Black River Technical College Law Enforcement Training Academy (*Id.*).  In 2018, Officer Clark completed approximately 63 hours of CLEST certified training (*Id.*, ¶ 103).[5]

Officer Magill worked in law enforcement for approximately 11 years, including eight-and-a-half years at the WMPD (*Id.*, ¶ 104).  He completed his basic law enforcement training at the Mississippi Law Enforcement Officers' Training Academy (*Id.*).  In 2018, Officer Magill completed approximately 110 hours of CLEST certified training (*Id.*, ¶ 105).

Sergeant McKee began his career in law enforcement in 1995 (*Id.*, ¶ 106).  He has worked for the WMPD for eight years (*Id.*).  He was promoted to Sergeant in 2016 (*Id.*).  He completed his basic law enforcement training with the State of South Carolina Criminal Justice Academy (*Id.*).  In 2018, Sergeant McKee completed approximately 106 hours of CLEST certified training (*Id.*, ¶ 107).

Officer Presley worked with the WMPD for approximately eight-and-a-half years (*Id.*, ¶ 108).  He completed his basic law enforcement training at the police academy in Camden, Arkansas (*Id.*).  In 2018, Officer Presley completed approximately 43 hours of CLEST certified training (*Id.*, ¶ 109).

## II.    Legal Standard

### A.    Summary Judgment

---

[5]  Paragraph 103 of the defendants' statement of undisputed facts reads as follows:  "In 2018, Officer Buford completed approximately 63 hours of CLEST certified training" (Dkt. No. 22, ¶ 103).  However, paragraph 101 indicates that Officer Buford completed approximately 243 hours of CLEST training (*Id.*, ¶ 101).  After looking to the record citation for paragraph 103, the Court believes this discrepancy to be a simple naming error and concludes that paragraph 103 refers to Officer Clark's CLEST training hours (Dkt. No. 20-5, at 63-64).

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Federal Rule of Civil Procedure 56 and noting that summary judgment is proper if there is no genuine issue of material fact for trial). Under such circumstances, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322. "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986).

### B.     Liability Under 42 U.S.C. § 1983 And The ACRA

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983.  Municipalities and their employees are suable "persons" under § 1983, and the employees can be sued in both their official and individual capacities.  *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).  A suit against a municipal employee in his or her official capacity is treated as a suit against the municipality for which the employee works.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Hess v. Ables*, 714 F.3d 1048, 1054 (8th Cir. 2013).  A municipality is not liable under § 1983 unless there is an unconstitutional act by one of its employees and its official policy or custom caused the act.  *Monell*, 436 U.S. at 694; *Webb v. City of Maplewood*, 889 F.3d 483, 487 (8th Cir. 2018); *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) ("[T]o establish the liability of an official acting in his official capacity, the plaintiff must prove that 'a policy or custom [of the city] caused the alleged violation.'" (citation omitted)).

To the extent Mr. Brown's Estate brings claims pursuant to the ACRA, the ACRA prohibits persons, acting under color of state law, from depriving any person of any rights, privileges, or immunities secured by the Arkansas Constitution.  Ark. Code Ann. § 16-123-105; *see also West v. Atkins*, 487 U.S. 42 (1988).  The ACRA expressly requires that courts look to federal civil rights law for guidance.  *See Island v. Buena Vista Resort*, 103 S.W.3d 671, 675–76 (Ark. 2003).  As relevant, here, the Arkansas Supreme Court has stated that Article 2, § 15 of the Arkansas

Constitution is "virtually identical to the Fourth Amendment" and will be interpreted "in the same manner as the United States Supreme Court interprets the Fourth Amendment." *Rainey v. Hartness*, 5 S.W.3d 410, 415 (Ark. 1999). As a result, this Court determines that its analysis of Mr. Brown's Estate's federal constitutional claims under § 1983 is equally applicable to the state constitutional claims under the ACRA.

### C.    Qualified Immunity

Officers sued under § 1983 in their individual capacities can raise qualified immunity as a defense. This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* Plaintiffs must meet both steps to defeat qualified immunity, and courts can begin the analysis with either step. *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015).

To determine whether qualified immunity is appropriate under the ACRA, courts apply the standard used for qualified immunity claims in federal civil rights actions. *Sullivan v. Coney*, 427 S.W.3d 682, 685-86 (2013 Ark.) (internal citation and quotation omitted). Under this analysis, a motion for summary judgment based on qualified immunity is precluded only when the plaintiff has: (1) asserted a statutory or constitutional violation, (2) demonstrated that the statutory or constitutional right is clearly established, and (3) raised a genuine issue of fact as to whether the official would have known that the conduct violated that clearly established right. *Id.* Therefore, "[a]n official is immune from suit if his or her actions did not violate clearly established principles

of law of which a reasonable person would have knowledge." *Smith v. Brt*, 211 S.W.3d 485, 489 (Ark. 2005). The objective reasonable-person standard is a legal inquiry, and whether summary judgment on grounds of qualified immunity is appropriate from a particular set of facts is a question of law. *Id.* "[T]he burden remains on the proponent of the immunity to establish the relevant predicate facts, and at the summary-judgment stage the nonmoving party is given the benefit of all reasonable inferences." *Baldridge v. Cordes*, 85 S.W.3d 511, 515 (Ark. 2002).

### D. Statutory Immunity Under Arkansas Law

Defendants in their answer assert that they are entitled to "any and all state and federal immunities including but not limited to, tort immunity, pursuant to Ark. Code Ann. § 21-9-301, and qualified and good faith immunities." (Dkt. No. 9, ¶ 3). Pursuant to Arkansas Code Annotated § 21-9-301(a), "all counties, municipal corporations, school districts, public charter schools, special improvement districts, law enforcement agencies for and certified law enforcement officers employed by a public or private institution of higher education, and all other political subdivisions of the state and any of their boards, commissions, agencies, authorities, or other governing bodies shall be immune from liability and from suit for damages except to the extent that they may be covered by liability insurance." Subsection (b) provides that "[n]o tort action shall lie against any such political subdivision because of the acts of its agents and employee." Ark. Code Ann. § 21-9-301(b).

### III. Parties And Claims

Mr. Brown's Estate identifies several defendants in its operative complaint (Dkt. No. 1, ¶¶ 2-3). The Estate sues Chief West in his official and individual capacity, alleging that at "all relevant times alleged herein, he was appointed and acting Chief of the West Memphis Police Department" (*Id.*, ¶ 2). Mr. Brown's Estate claims that Chief West was the primary policy maker

under Arkansas law, claiming that Chief West's duties included:  "establishing and enforcing, failing to establish, or failing to enforce the policies, practices, customs, procedures and regulations for the conduct of the WMPD and its employees" (*Id.*).  Additionally, the Estate sues Officers Bohanon, Clark, Buford, McKee, Magill, and Presley in their official and individual capacities (*Id.*, ¶ 3).

Mr. Brown's Estate seeks to recover under § 1983 and claims that each of the defendants violated Mr. Brown's rights secured under the Fourth and Fourteenth Amendments to the United States Constitution (*Id.*, ¶ 5).  42 U.S.C. § 1983.  The Estate also seeks to recover under the ACRA, Ark. Code Ann. § 16-123-101 *et seq.,* and the common law torts of outrage and battery (*Id.*, ¶¶ 5-6, 38(b)).

## IV.   Analysis

### A.   Qualified Immunity From Suit On The Individual Capacity Claims

Mr. Brown's Estate characterizes the defendants' shooting of Mr. Brown as a violation of Mr. Brown's right to be free from unreasonable seizures under the Fourth Amendment to the Constitution, made applicable to the states through the Fourteenth Amendment (Dkt. No. 1, ¶ 32). *See generally Mapp v. Ohio*, 367 U.S. 643, 655, (1961).  The Estate claims that the defendant officers acted under color of state law in a manner sufficient to bring the instant action under § 1983 (*Id.*).  Defendants raise several defenses (Dkt. No. 21).  However, the Court begins its analysis by determining if defendants are entitled to qualified immunity from the Estate's § 1983 and ACRA claims against them in the individual capacity, as qualified immunity entitles government actors sued in their individual capacities to be free "from suit" and should be resolved "at the earliest possible stage in litigation."  *Hunter v. Bryant*, 502 U.S. 224, (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Based on the record evidence, the Court concludes

that defendants are entitled to qualified immunity from the Estate's claims against them in the individual capacity.

Qualified immunity "shields a government official from liability and the burdens of litigation unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Truong v. Hassan*, 829 F.3d 627, 630 (8th Cir. 2016). An official fails to secure qualified immunity when the court determines: (1) the plaintiff demonstrates facts sufficient to "make out a violation of a constitutional or statutory right," and (2) the right violated is clearly established when the alleged misconduct occurs. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Courts may choose which part of the inquiry to decide first. *Greenman*, 787 F.3d at 887.

### 1.     Fourth Amendment Claim

This Court will first determine whether the Estate has demonstrated facts sufficient to show that defendants seized Mr. Brown within the meaning of the Fourth Amendment. *See generally Truong*, 829 F.3d at 630; *Greenman*, 787 F.3d at 887. The Estate claims that defendants violated the Fourth Amendment by subjecting Mr. Brown to excessive force when three stray bullets, fired by police, struck Mr. Brown (Dkt. Nos. 1, ¶ 32; 22, ¶ 71). The Supreme Court made clear "that a seizure occurs only when the pursued citizen is physically touched by the police or when he submits to a show of authority by the police." *Cole v. Bone*, 993 F.2d 1328, 1332 (8th Cir. 1993) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). "In adopting this definition, the [Supreme] Court expressly stated that an assertion of authority by the police without submission by the pursued citizen does not constitute a seizure." *Id.* Important to the case at bar, "a seizure does not occur during the course of a police pursuit of a fleeing vehicle if the pursuit, as a show of

authority, does not produce a stop." *Id.*  Thus, police do not seize the target of their gunfire until a discharged bullet strikes that target.  *Id.* at 1332-33.

However, this does not end the Fourth Amendment seizure analysis in the instant case because it is undisputed that bullets from defendants' weapons hit Mr. Brown.  "Not every police officer act that results in a restraint on liberty . . . constitutes a seizure."  *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008) (citing *Brower v. County Inyo*, 489 U.S. 593, 597 (1989)).  The restraint must result from "means intentionally applied."  514 F.3d at 760 (quoting *Brower*, 489 U.S. at 597).  This is to say, the person the police intend to shoot must be the person invoking his right to be free from unreasonable seizures to demonstrate a constitutional violation for § 1983 purposes.  514 F.3d at 759-60.

Bystanders, on the other hand, "are not seized for Fourth Amendment purposes when struck by an errant bullet."  *Id.* at 760; *see also Simpson v. City of Fort Smith*, 389 F. App'x 568, 571 (8th Cir. 2010) (noting that the Eighth Circuit held in *Moore* that "bystanders are not seized for Fourth Amendment purposes when struck by an errant bullet in a shootout.").  In adopting this bystander rule, the Eighth Circuit specifically cited decisions in the First, Second, and Tenth Circuits involving police unintentionally shooting vehicle passengers.  *See Childress v. City of Arapaho*, 210 F.3d 1154, 1156–57 (10th Cir. 2000); *Medeiros v. O'Connell*, 150 F.3d 164, 167–69 (2d Cir. 1998); *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791, 794–96 (1st Cir. 1990).  In each of those cases, the appeals courts barred hostage passengers from recovering after being shot by police. *Childress*, 210 F.3d at 1156–57; *Medeiros*, 150 F.3d at 167–69; *Landol–Rivera*, 906 F.2d at 794– 96.  Each Circuit concluded that police did not violate those passengers' Fourth Amendment rights because police did not restrict the passengers' liberty through "means intentionally applied."

*Brower*, 489 U.S. at 597; *Childress*, 210 F.3d at 1156–57; *Medeiros*, 150 F.3d at 167–69; *Landol–Rivera*, 906 F.2d at 794–96.

For example, in *Landol–Rivera v. Cruz Cosme*, the First Circuit declined "to hold that [a] hostage was seized for Fourth Amendment purposes when police officers fired at [the] suspect's getaway car and accidentally struck the hostage." *Moore*, 514 F.3d at 760 (citing *Landol–Rivera*, 906 F.2d at 794–96). The Second Circuit similarly held in *Medieros v. O'Connell* that, when a hostage is "struck by an errant bullet, the governing principle is that such consequences cannot form the basis of a Fourth Amendment violation." 514 F.3d at 760 (citing *Medeiros*, 150 F.3d at 167–69). The Tenth Circuit took the same approach in *Childress v. City of Arapaho* when it declined to allow a hostage passenger to recover under § 1983 after being shot by police because "[t]he officers intended to restrain [a] minivan and the fugitives [inside], not [the hostages.]" 514 F.3d at 760 (quoting *Childress*, 210 F.3d at 1156–57). Even if there is a circuit split as defendants identify in their briefing (Dkt. No. 21, at 5-7), this is not an open question in the Eighth Circuit. This Court is bound to follow controlling Eighth Circuit precedent.

The record is silent as to whether Mr. Brown was a hostage (Dkt. No. 22). Regardless, the Court does not believe his status as a hostage or as a passenger, willing or unwilling, creates any distinction that would lead to a different result under controlling law (*Id.*, ¶ 3).[6]

If police do not violate the Fourth Amendment rights of a non-targeted hostage by unintentionally shooting him, then the defendants cannot be said to have violated Mr. Brown's Fourth Amendment rights given the undisputed facts before the Court (Dkt. No. 22, ¶¶ 59, 71).

---

[6] If the fact that Mr. Brown was not a hostage but instead a passenger is significant, that significance likely means the law in this area was not clearly established at the time of the events giving rise to the Estate of Mr. Brown's claims, thereby entitling the defendant officers to qualified immunity on these claims. *See Thurmond v. Andrews*, 972 F.3d 1007 (8th Cir. 2020) (examining when a right is clearly established for qualified immunity analysis).

*Moore*, 514 F.3d at 760.  The record evidence shows that following a 12-minute high-speed chase, police officers trained their guns on the vehicle's driver, Ms. Rivera (Dkt. Nos. 22, ¶¶ 69, 71-72; 29).  The parties do not dispute that defendants intended to shoot only Ms. Rivera because her reckless driving "posed an immediate threat of serious physical injury . . . [and] possibly death" to each of them (Dkt. Nos. 22, ¶¶ 70-71; 29).  The parties do not dispute that defendants, with their guns aimed at Ms. Rivera, opened fire and struck her 14 times (Dkt. Nos. 22, ¶¶ 71-72; 29).  The parties do not dispute that three police bullets struck Mr. Brown the passenger, while the defendants aimed only at Ms. Rivera the driver (Dkt. Nos. 22, ¶ 71; 29).

Mr. Brown's Estate claims that Federal Rule of Civil Procedure 56 is "inapplicable in this case," presumably because the Estate believes material facts are in dispute (Dkt. No. 27, ¶ 2).  However, the Estate does not dispute most of the material facts in this case and does not take issue with the fact that defendants intended to shoot only Ms. Rivera, not Mr. Brown (Dkt. Nos. 22, ¶ 71; 29).  *Moore*, 514 F.3d at 759–60.  Under these undisputed facts, viewed in the light most favorable to Mr. Brown's Estate and given the controlling law, this Court cannot conclude that police restrained Mr. Brown's liberty through "means intentionally applied."  *Id.* (citing *Brower*, 489 U.S. at 597).  For this reason, the Court finds, on the record evidence, that Mr. Brown's Estate has not demonstrated under controlling Eighth Circuit law facts sufficient for a reasonable factfinder to determine that defendants violated Mr. Brown's constitutional right to be free from unreasonable seizures (Dkt. Nos 1; 22; 29).  514 F.3d at 759–60; *see also Brower*, 489 U.S. at 597; *Childress*, 210 F.3d at 1156–57; *Medeiros*, 150 F.3d at 167–69; *Landol–Rivera*, 906 F.2d at 794–96.

2.      **Other Constitutional Claims**

In the summary judgment response, the Estate of Mr. Brown argues a Fourteenth Amendment due process claim (Dkt. No. 28, at 6), which defendants address in their reply (Dkt. No. 31).  First, the Estate of Mr. Brown asserts a state created danger exception.  Based on the undisputed record evidence, defendant officers did not place Mr. Brown in a position of danger that he would not otherwise have faced.  The Supreme Court has expressly held that the driver in these circumstances based on the undisputed record evidence before the Court is the person who puts the passenger in danger in situations such as this, not the officers.  *Plumhoff v. Richard*, 572 U.S. 765, 778 (2014); *see also Scott v. Harris*, 550 U.S. 372, 384 (2007).  The Estate of Mr. Brown cannot prevail on its claims under this theory.  Defendants are entitled to judgment as a matter of law in their favor on this theory of recovery.

To the extent the Estate of Mr. Brown seeks to rely on a substantive due process claim under the Fourteenth Amendment, Mr. Brown must show that defendant officers had "a purpose to cause harm unrelated to the legitimate object of arrest, which would satisfy the element of arbitrary conduct shocking to the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 836, 844 (1998).  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849.  Based on the undisputed material facts, defendants are entitled to judgment as a matter of law in their favor on this theory of recovery, too.  The parties do not dispute that defendant officers did not intend to cause harm to Mr. Brown; all discharged their firearms aiming at the driver of the vehicle Ms. Rivera, not Mr. Brown.  The officers were engaged in actions in an attempt to stop a violent, fleeing felon. *County of Sacramento*, 523 U.S. at 836, 855.

In the alternative, defendant officers also are entitled to qualified immunity on these alternative Fourteenth Amendment constitutional claims because the Estate of Mr. Brown has not demonstrated that the law it contends was violated was clearly established at the time of the events giving rise to these claims; the Estate of Mr. Brown does not cite to any factually analogous, binding precedent or robust consensus of persuasive authority that was decided at the time of the incident that clearly established defendant officers' conduct was unconstitutional under these Fourteenth Amendment theories.  *See Thurmond v. Andrews*, 972 F.3d 1007 (8th Cir. 2020) (examining when a right is clearly established for qualified immunity analysis).

On the record evidence before the Court, viewed in the light most favorable to the Estate, defendants are entitled to qualified immunity.  The Court enters judgment in favor of defendants in their individual capacities and dismisses with prejudice Mr. Brown's Estate's § 1983 and ACRA claims against defendants in their individual capacities.

### B.      Remaining Official Capacity Claims

Given that Mr. Brown cannot demonstrate a Fourth Amendment or Fourteenth Amendment violation, Mr. Brown's Estate cannot move forward with any of its § 1983 and ACRA claims. Without a showing that defendant officers violated the Constitution, there can be no individual or official capacity claims against Chief West and no official capacity liability for the claims alleged. *City of L.A. v. Heller,* 475 U.S. 796, 799 (1986) (per curiam); *Carpenter v. Gage*, 686 F.3d 644, 651 (8th Cir. 2012).

Even if the Estate of Mr. Brown had demonstrated an underlying constitutional violation, which it has not, the Estate of Mr. Brown did not respond to any of defendants' arguments in support of their motion for summary judgment.  Failure to oppose a basis for summary judgment

constitutes waiver of that argument.  *Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009).

Moreover, the Estate has failed to show through record evidence that a purported failure to train or supervise on the part of defendants led to the events about which the Estate of Mr. Brown complains.  The Estate of Mr. Brown also has failed to show through record evidence that a city policy or custom was the moving force behind any alleged constitutional violation.

For all of these reasons, defendants are entitled to judgment as a matter of law on the Estate's § 1983 and ACRA claims against defendants in their individual and official capacities.

### C.     Mr. Brown's Estate's State Law Claims

In addition to seeking relief under § 1983 and the ACRA, the Estate of Mr. Brown refers in its complaint to a tort of outrage and battery claim under Arkansas law.

Arkansas courts take a very narrow view of claims for the tort of outrage.  *See Hamaker v. Ivy*, 51 F.3d 108, 110 (8th Cir. 1995) (citing *Ross v. Patterson,*  817 S.W.2d 418, 420 (1991)).  The courts have crafted a four-part test for a *prima facie* case of outrage:  (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.  *Hamaker*, 51 F.3d at 110 (citing *Hollingsworth v. First Nat'l Bank,* 846 S.W.2d 176, 178 (Ark. 1993) (internal quotations omitted)).

Considering the undisputed record evidence, even construing all reasonable inferences in favor of the Estate of Mr. Brown, defendants' conduct as alleged by the Estate of Mr. Brown does

not meet the exacting standard under Arkansas law for this claim. No reasonable juror could find in favor of the Estate of Mr. Brown on this claim, given the undisputed record evidence.

As to the battery claim, the applicable statute of limitations for assault and battery tort claims is one year in Arkansas. Ark. Code Ann. § 16-56-104; *see also Moody v. Tarvin*, 486 S.W.3d 242, 244 (Ark. 2016). The events giving rise to these claims occurred on January 16, 2019, while the Estate of Mr. Brown filed suit on March 31, 2020 (Dkt. No. 1). The Estate's battery claim under Arkansas law is time-barred, and defendants are entitled to judgment as a matter of law on this claim.

For these reasons, the Court grants judgment as a matter of law in favor of the Estate of Mr. Brown on these state law claims.

## V.    Conclusion

For the foregoing reasons, the Court grants the defendants' motion for summary judgment on Mr. Brown's Estate's claims and dismisses with prejudice those claims. The request for relief is denied.

It is so ordered this 30th day of March, 2022.

Kristine G. Baker
United States District Judge